Signed and Filed: July 26, 2011

_____
**DENNIS MONTALI
U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re | Bankruptcy Case |
|---|---|
| EVA LOPEZ ARAUJO, | No. 11-30078DM |
| Debtor. | Chapter 13 |

MEMORANDUM DECISION ON
DEBTOR'S MOTION SETTING PROPERTY VALUE

I.  INTRODUCTION

Before the court is a Motion Setting Property Value ("Motion") filed by Debtor Eva Lopez Araujo ("Debtor") on May 18, 2011, to determine the value of personal property securing an allowed claim. The personal property at issue is a 2006 Toyota Sienna LE (the "Vehicle"). The secured creditor, Travis Credit Union ("Travis"), holds a consensual lien secured by the Vehicle.

Debtor is seeking to confirm a chapter 13 plan and is attempting to "cram down" Travis's claim to the current value of the vehicle, pursuant to 11 U.S.C. § 506(a).[1]  Travis objected to Debtor's proposed

---
[1] Reference to the "Bankruptcy Code" is to the Bankruptcy Reform Act of

value of the Vehicle and objected to confirmation of the plan. Debtor filed a Motion Setting Property Value ("Motion") to have the court determine the value of the Vehicle.

By the Motion, Debtor seeks an order fixing the retail value of the Vehicle in the amount of $5,700. In support of its Motion, Debtor filed a Memorandum of Points and Authorities in Support of Motion Setting Property Value ("Debtor's Memorandum"), and two declarations: one by Jason Honaker, the attorney for Debtor ("Honaker Declaration"), and one by Anthony Martinez, an ASE Certified Automobile Technician ("Martinez Declaration"). In response to the Motion, Travis filed an Opposition to Motion Setting Property Value ("Opposition"), and a declaration by Wm. Gary Moffat, an employee of Remarketing Services of America who appraises vehicles ("Moffat Declaration").

The parties agreed to submit the matter on the papers, waiving any right to cross examine adverse witnesses.

II.     FACTS[2]

Debtor filed a voluntary petition for relief under chapter 13 on January 7, 2011 ("Petition Date"). Travis holds a consensual lien on the Vehicle in the amount of $14,242.43 as of the Petition Date. Debtor initially estimated the value of the Vehicle at $6,500 on her Schedule B. Travis filed a proof of claim and objected to confirmation of Debtor's chapter 13 plan on the basis that the correct value of the

---

1978, as amended, 11 U.S.C. § 101, et seq. Unless otherwise indicated, references to statutory sections are to sections of the Bankruptcy Code.

[2] The following discussion constitutes the court's findings of facts and conclusions of law. Fed. R. Bankr. P. 7052(a).

Vehicle was $14,465. In the Motion, Debtor claimed that the correct value of the Vehicle was $5,700.

A. Debtor's Valuation

Debtor, in her Memorandum, claimed a value for the Vehicle and relied on repair and maintenance cost information provided in the Martinez Declaration. In that declaration, Anthony Martinez recounted the findings of his inspection of the Vehicle. Martinez stated that the Vehicle had a variety of cosmetic and mechanical issues that needed to be addressed including misaligned bumpers, worn brake pads and rotors, and he noted that wheel realignment was necessary. Martinez concluded that the Vehicle required $2,675 worth of repairs and maintenance.

Debtor's Memorandum first considered and rejected a valuation of the Vehicle derived from the Kelley Blue Book website ("KBB website"). Debtor examined the KBB website's valuation data for a similar vehicle sold at retail and a similar vehicle in "Average" condition sold between private parties. Debtor ultimately determined that the website Edmunds.com provided more reliable valuation data than the KBB website. Debtor stated that Edmunds.com valued the Vehicle at a "Dealer Retail" "True Market Value" price of $8,411 in "Average" condition. Debtor did not provide a description of what qualities Edmunds.com uses to determine that a vehicle is in "Average" condition. Debtor then assumed that the $2,675 in needed repairs would render the Vehicle in "Average" condition and subtracted the repair cost from the starting price of $8,411 to arrive at a value of $5,736. In sum, Debtor claimed

the appropriate replacement value of the Vehicle is $5,736.[3]

B. <u>Travis's Valuation</u>

In its Opposition, Travis claimed that the correct replacement value of the Vehicle is $14,645. Travis relied on the Kelley Blue Book Official Car Guide, January 2011 edition, for its valuation. Travis submitted its Opposition before it had an opportunity to appraise the Vehicle, but thereafter filed the declaration of Moffat, who appraised the value of the Vehicle at $10,500. In arriving at that valuation, he used a repair estimate of $1,377.53; searched the website Cars.com for similarly situated vehicles for sale; and reviewed the N.A.D.A. Guide and Kelley Blue Book ("KBB") for valuation data. Moffat listed the steps he used to reach his appraisal value but did not describe the nature of the steps or how they contributed to the appraised value. Four exhibits were attached to the Moffat Declaration, but two of the exhibits, a print-out of the Cars.com website, purportedly showing similar vehicles for sale, and a print-out of the KBB website, were illegible and are unhelpful. This court's law clerk requested that Travis provide legible copies of the exhibits, but the replacement exhibits were still illegible and remained unhelpful.

III. <u>DISCUSSION</u>

---

[3] There is a discrepancy regarding what value the Debtor claimed the Vehicle is worth. In her Memorandum, Debtor "requests that the court enter an order valuing the Siena at $5,736," but then states in the next sentence that she will modify her chapter 13 confirmation plan "[u]pon obtaining an order valuing the vehicle at $5,700." Additionally, the Motion requested the court determine the value of the Vehicle at $5,700. However, the court will use the $5,736 amount that Debtor reached in its Memorandum using the Edmunds.com valuation data as Debtor's claimed valuation, because there appears to be no basis for the $5,700 value.

- 4 -

The parties have provided competing valuations of the Vehicle; Debtor claimed the Vehicle should be valued at $5,736 and Travis claimed the Vehicle should be valued at $10,500. Neither side was wholly persuasive and for the following reasons the court finds that proper replacement value of the Vehicle is $9,433.50.

Section 506(a) of the Bankruptcy Code describes the extent to which secured claims are allowed and the method of valuing a secured claim. § 506(a). More specifically, § 506(a)(2) provides:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. § 506(a)(2).

Section 506(a)(2) continues to define the replacement value of personal property as "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." § 506(a)(2). Unfortunately, "no consensus has emerged in the case law interpreting § 506(a)(2) as to how replacement value for motor vehicles should be determined." In re Pearsall, 441 B.R. 267, 270 (Bankr. N.D. Ohio 2010).

Courts have employed a variety of vehicle valuation methods under § 506(a)(2), and presently the Ninth Circuit has not established a uniform method. See In re Ayres, 2010 Bankr. LEXIS 519 at *13 (Bankr. N.D. Cal. February 16, 2010) (collecting cases detailing vehicle valuation and describing the state of the law in the Ninth Circuit). However, in In re Morales, the United States Bankruptcy Court for the Central District of California determined that retail value should be

calculated "by adjusting the Kelley Blue Book or N.A.D.A. Guide retail value for a like vehicle by a reasonable amount in light of the evidence presented regarding the condition of the vehicle or any other relevant factors." In re Morales, 387 B.R. 36, 45 (Bankr. C.D. Cal. 2008).

The vehicle valuation authorities referenced in In re Morales compile and include in their publications data regarding various types of sales including "private sale" and "dealer retail." In re Ayres, 2010 Bankr. LEXIS at *16. It is important to note that the "dealer retail" price used in the valuation authorities is not equivalent to the term "the price a retail merchant would charge" as used in § 506(a)(2); rather, the "Bankruptcy Code's definition of 'retail' includes an adjustment for the age and condition of the vehicle; KBB defines 'retail' as the price for a vehicle that is in 'excellent condition' with the provision that less than 5% of vehicles for sale qualify as excellent." In re Anda-Ramirez, 359 B.R. 794, 797 (10th Cir. BAP 2007); accord In re Morales, 387 B.R. at 45-46.

Thus, the retail values provided in the valuation authorities do not correlate exactly to the Bankruptcy Code's use of "retail." As a result, courts must adjust the valuation authorities' retail value "to account for the vehicles [sic] mileage and other condition, or other applicable factors." In re Ayres, 2010 Bankr. LEXIS at *17. Evidence supporting an adjustment may be introduced by way of declaration, testimony, vehicle advertisements, expert or appraisal reports, and private party values, as appropriate. In re Morales, 387 B.R. at 46

- 6 -
Case: 11-30078   Doc# 54   Filed: 07/26/11   Entered: 07/27/11 14:48:23   Page 6 of 13

(internal citations omitted). Conversely, rather than adjust the retail value to account for a vehicle's particular condition, courts have utilized the "private sale" valuation, which values vehicles based on variable conditions, i.e. private sale values are provided for vehicles in conditions other than "excellent condition." See In re De Anda-Ramirez, 359 B.R. at 798 (finding an absence of clear error in a lower court's use of private party values).

However, according to the court in In re Morales, the retail values, and not the private party values, are the appropriate starting points because the text of § 506(a)(2) refers to "the price a retail merchant would charge" and does not refer to the price a private party would charge. In re Morales, 387 B.R. at 46. The language of § 506(a)(2) provides further support for the use of retail values rather than private party values in the first sentence that states replacement value should be calculated "without deduction for costs of sale or marketing." § 506(a)(2); In re Morales, 387 B.R. at 46. Although "replacement value" is modified with respect to property acquired for personal use in the second sentence of § 506(a)(2), the rule regarding costs of sale or marketing is not modified and is therefore still applicable. § 506(a)(2); In re Morales, 387 B.R. at 46. Consequently, in contrast to private party values, "the retail value better approximates a price that includes the 'costs of sale and marketing,'" even if downward adjustments must be made to accommodate a less then excellent or optimal condition of a vehicle. In re Morales, 387 B.R. at 46.

Neither party provided sufficient information to accurately determine the retail value of the Vehicle. Debtor relied on a valuation from Edmunds.com for a vehicle in "Average" condition sold at a "dealer retail" price, but neglected to describe what qualities Edmunds.com considers typical of a vehicle in "Average" condition.[4] Additionally, Debtor did not describe the Edmunds.com criteria for a vehicle in "Rough" condition,[5] the quality below "Average." In sum, Debtor made a conclusory determination that Edmunds.com produced the most accurate valuation and did not sufficiently establish why the Vehicle, as is, failed to satisfy the criteria for "Average" condition.

Travis's valuation is no improvement over Debtor's. Travis's valuation consists primarily of the Moffat Declaration, which was made after Travis had the opportunity to appraise the Vehicle. The Moffat Declaration failed to describe in detail the methodology used to reach the appraised value of $10,500; two of the attached exhibits were

---

[4] According to Edmunds.com when a vehicle is in "Average" condition:

> Vehicle may have a few mechanical and/or cosmetic problems and may require a considerable amount of reconditioning. Exterior paint has some dullness. Vehicle may have a considerable amount of scratches or dings. Interior material is slightly worn and faded. Tires have some usable tread remaining. Vehicle has a clean title and has the ability to pass an emissions inspection. Edmunds.com, 2006 Toyota Sienna Minivan – Prices with Options, http://www.edmunds.com/ toyota/sienna/2006/tmv-appraise.html?sub=minivan&style=100604394 (last visited July 26, 2011).

[5] Edmunds.com provides that a vehicle in "Rough" condition has "[s]everal mechanical and/or cosmetic problems requiring significant repairs. Tires may need to be replaced. Vehicle may need minor repairs to pass an emissions inspection, but it has a clean title." Edmunds.com, 2006 Toyota Sienna Minivan – Prices with Options, http://www.edmunds.com/toyota/sienna/2006/tmvappraise.html?sub=minivan&style= 100604394 (last visited July 26, 2011).

illegible; and photographs contained in another exhibit were so poor in quality that they were unhelpful.

One reason for the discrepancy in valuations is that the parties disagree over what features are standard for the Toyota Sienna LE trim. Specifically, in the N.A.D.A. Guide valuation included in the Moffat Declaration a "Luggage Rack," valued at $75; a "Power Sliding Door," valued at $225; and a "Power Third Row Seat," valued at $225, are included as optional equipment that increase the value of the Vehicle. Debtor argued that the equipment listed as optional was in fact standard equipment for the LE trim. According to the brochure for the 2006 Toyota Sienna, available on the Toyota website and referenced in the Honaker Declaration, the LE trim standard equipment includes a "Luggage Rack," but a "Passenger-Side Power Sliding Door" is a piece of optional equipment. A "Power Third Row Seat" is not an available option. Thus, the N.A.D.A. Guide valuation must be decreased from a "Clean Retail" price of $13,300 by $300, the value of the standard or unavailable equipment initially included. Although N.A.D.A. Guide values a "Power Sliding Door" at $225, KBB only values a "Power Sliding Door" at $35.

To summarize, Debtor, utilizing the Edmunds.com "Average" "Dealer Retail" valuation price and subtracting a repair estimate from that valuation, claimed the replacement value of the Vehicle as of the Petition Date was $5,736. Travis, on the opinion of a vehicle appraiser who considered a repair estimate, similarly situated vehicles listed for sale, KBB value, and N.A.D.A. Guide value, claimed the

replacement value of the Vehicle was $10,500. Additionally, according to the valuation authorities, the retail value of the Vehicle when sold from a dealer are as follows: the KBB retail value of the Vehicle is $12,210; the N.A.D.A. Guide retail value of the Vehicle is $13,000; and the Edmunds.com "Dealer Retail" value of the vehicle in "Average" condition is $8,634.[6]

Although at least one bankruptcy court in the Ninth Circuit has relied on Edmunds.com for vehicle valuation data, the standard is to utilize either KBB or the N.A.D.A. Guide. See In re Morales, 387 B.R. at 45 (stating that vehicle valuation is determined using either KBB or N.A.D.A. Guide); compare In re Ayres, 2010 Bankr. LEXIS at *16 (using N.A.D.A. Guide and Edmunds.com to determine value). In this case, because KBB and N.A.D.A. Guide are explicitly referenced in In re Morales and the Edmunds.com valuation, $8,636, is inexplicably disparate from the KBB valuation of $12,210 and the N.A.D.A. Guide valuation of $13,000, the court will determine the value of the Vehicle utilizing the KBB and N.A.D.A. Guide valuations.[7]

---

[6] These valuations include, respectively, KBB's valuation of $35 for a "Power Sliding Door," N.A.D.A. Guide's valuation of $225 for a "Power Sliding Door," and Edmunds.com's valuation of $223 for a "Power Sliding Door."

[7] Although the court in In re Morales specifically identified the Kelley Blue Book and N.A.D.A. Guide as the authoritative references for establishing value, other courts have employed the data provided by the valuation website Edmunds.com when establishing the value of a vehicle. See In re Gehring, 2011 Bankr. LEXIS 2555 at *2, *7, No. 11-60611 (Bankr. N.D. Ohio July 1, 2011); In re Ayres, 2010 Bankr. LEXIS 519 at *20-21, No. 09-56695 (Bankr. N.D. Cal. February 16, 2010). But see In re Guerra, 2008 Bankr. LEXIS 4303 at *5 n. 4, No. 08-10219-B-13 (Bankr. E.D. Cal. August 7, 2008) (refusing to consider a print-out detailing

First, consideration of the KBB retail price requires that the price must be adjusted downward to reflect discrepancies between the KBB retail price and the retail price employed by the Bankruptcy Code. In re Penny, 2011 WL 204888 at *2-*3. The price must be adjusted downward to reflect a vehicle that is not in excellent or optimal condition and to reflect that the KBB retail price represents the dealer's asking price, not its sale price. Id. Both parties agree that the Vehicle is not in perfect condition; each side presented differing repair estimates for the vehicle. Travis's repair estimate only contemplates superficial repairs to remove scratches, dents, etc., and does not address mechanical issues. Debtor's repair estimate includes both superficial repairs to the Vehicle's appearance and mechanical repairs, and therefore Debtor's repair estimate will be utilized because it is the more thorough evaluation of the Vehicle's necessary repairs. Thus, KBB's retail price for the Vehicle, $12,210, must be reduced by the cost of repairs to make the Vehicle optimal, $2,675, to $9,535. This new valuation must be reduced further to reflect the final price of the vehicle, not merely the dealer's asking price. Neither party provided evidence of the average difference between dealers' asking price and the ultimate sale price, therefore the court, in accordance with other courts' practices, adjusts the

---

valuation data from Edmunds.com attached to a declaration because the court determined it was inadmissible hearsay and lacked foundation as an expert opinion). Nevertheless, this court will only consider the valuation guides recognized as authorities in In re Morales, and finds them to be admissible evidence under Federal Rule of Evidence 803(17). See In re Penny, 2011 WL 204888 at *17 (admitting into evidence valuation data from KBB because the values supplied "are based on actual transactions occurring in relevant regional markets").

Case: 11-30078   Doc# 54   Filed: 07/26/11   Entered: 07/27/11 14:48:23   Page 11 of 13

retail value by 5%, to $9,058.25. In re Penny, 2011 WL 204888 at *3. See In re Morales, 387 B.R. at 42, 45.

Second, consideration of the N.A.D.A. Guide's "Clean Retail" price requires that the price must be adjusted downward in the same manner the KBB retail price was. Therefore, N.A.D.A. Guide's retail price for the Vehicle, after downward adjustments for necessary repairs and to reduce asking price to sale price, is $9,808.75.[8]

The court's analysis produces two potential valuations for the Vehicle: $9,058.25 and $9,808.75. The court in In re Morales was not faced with competing values from KBB and N.A.D.A. Guide and thus did not address how to reconcile a discrepancy between the valuations. In re Morales, 387 B.R. at 48. However, the court in In re Morales ultimately determined the retail value of the vehicle by computing the average of the KBB value and advertised retail prices for similar vehicles.[9] Id. Thus, utilizing the averaging computation employed in In re Morales, and recognizing the arbitrariness of the process, this court determines that the retail value of the Vehicle is the $9,433.50, the average of the KBB retail value, $9,058.25, and the N.A.D.A. Guide retail value, $9,808.75.

IV.     CONCLUSION

For the foregoing reasons, the court sets the replacement value of

---

[8] This number was reached by reducing the retail price of $13,000 by the repair costs of $2,675 for a total of $10,325. That number was then reduced by 5% to reflect the difference between asking price and the ultimate sale price: $10,325 less $516.25 for a total of $9,808.75.

[9] In performing its calculations the court acknowledged that § 506(a)(2) is prone to arbitrary results. In re Morales, 387 B.R. at 48.

Case: 11-30078   Doc# 54   Filed: 07/26/11   Entered: 07/27/11 14:48:23   Page 12 of 13

Debtor's 2006 Toyota Sienna LE at $9,433.50 for the purposes of § 506(a)(2). Counsel for Debtor should submit a form of order consistent with this Memorandum Decision and should comply with B.L.R. 9021-1 and B.L.R. 9022-1.

* * END OF MEMORANDUM OF DECISION * *

- 13 -